Case 15-3568 MISC Berhad v. Advanced Polymer Coatings Inc. et al. Oral argument not to exceed 15 minutes per side. Mr. Stace for the appellant. Good afternoon, Your Honor. You can take one second. Good afternoon, Your Honor. My name is Ben Stace, and I represent the appellant in MISC Berhad in this matter. If I may, I'd like to reserve five minutes before we vote. Can you pull the mic a little higher? Sure. I see if we can get this worked out. All right. I think this works. Thank you, Your Honor. This appeal addresses a ship owner's ability to recover from the manufacturer of a critical component, a coating designed to protect the cargo tanks of its tanker. The lawsuit here involves the undisputed failure of that product on two tankers, the Bacomali and the Balsam, built by one shipyard. The court below granted summary judgment to the manufacturer, Advanced Polymer, ruling that the ship owner, my client MISC Berhad, had no viable claims. At a minimum, this court should reverse the summary judgment as to MISC Berhad's breach of warranty claims. It should do so for two reasons. First, Advanced Polymer's written warranty, the district court here— Didn't the written warranty require some action on the part of the ship owner? I'm sorry, Your Honor? Didn't the warranty depend, obviously, on the ship owner properly installing the polymer? I don't think it did, Your Honor. The warranty— Were they supposed to have certain temperatures at which this was to be installed and certain specs to have that done? I appreciate the question. And I think what the question goes to is the relationship among the three parties and the different documents that are relevant to the relationship among the parties. The answer to your question as to the warranty itself, the answer is no. And I'd like to explain, if I can, by referring to the broader structure of this transaction. We're not dealing here with a simple bilateral arrangement. There's multiple documents and multiple parties. My client, MISC Berhad, requested that the shipbuilder use this marine line protective coating based on representations made by Advanced Polymer. And when that occurred, the shipyard, SLS, agreed to do so. But it agreed to do so only by excluding any responsibility for that product in its guarantee that it issued to my client, MISC Berhad. And that's one contract— So you went ahead and let them put it on? Well, yeah, and I'm getting to that. And I appreciate that, Your Honor. That's where I'm going next. So that's one contract, okay? That's Exhibit A to Advanced Polymer's Motion for Summary Judgment. The next relevant document, and this is where your question is heading, is the contract between the shipyard, SLS, and Advanced Polymer. And my submission is, if you look at that document— Wait a minute. Let's get back to that contract real quick. Okay. Did your client part of that contract? The contract between the shipyard and Advanced Polymer? Are we a party to it? Yeah. No, the answer is no. So what you are is one of those so-called third-party beneficiaries or something like that to a contract? Well, we don't need—we're not relying on third-party beneficiaries here. Well, I know, but you're not a party to the contract that you're relying on. We're not a party to the contract, but the documents— our submission is the documents have to be read as a whole. And we cited authority for that in our briefs. And I guess the best example is the Gordon v. Vincent Heumann case we cited from the Second Circuit. And there, of course, she had three parties, an artist and two publishers. And the question was what rights, if any, under certain copyrights, passed to who and when. And the court looked at all three documents and said, quite frankly, there was an ambiguity based on the relationship between all three parties based on those documents, and then sent the case back down for a trial to figure out what the facts were. So does all of that mean that you're—we're back to you're relying on the supposed ambiguity of 2.03 of the insurance guarantee? I think that's where this case turns, Your Honor. Yeah, that's where we're getting to, exactly. I suppose the question is you could read it and the phrase, if more than the deductible area per tank, which certainly sounds like we're talking about areas, not dollars. That's true in insurance. We talk about deductible as dollars a lot. But how do you say—how can you say that 2.03, when it says, only becomes effective if more than the deductible area per tank shows any break? And then it defines the 3.0. I noticed that in this contract it's the same for all time, but I suppose that in other contracts it might be 3% the first year, 6% the second, something like that. So, I mean, how do you get a different reading of 2.03 than that? So the submission that we made was that it's unintelligible. And the reason is, if you look at the entire language, Your Honor, the first clause, deductible means. Now take that sentence that you just read, talking about deductible area, which I'll submit isn't a defined term. And so in some ways the definition there immediately becomes circular, right? Because you're using a term deductible as defined based on a deductible area. But then drop down and look at the very next line. Deductible applies only when exceeding 3%. Now let's take that definition you just quoted and plop that in there. It applies when exceeding 3%. That begs the question, when what exceeds 3% of what? And so the document on its basis compares it— You say, of what? Seems to me pretty reasonable. You've got a tank, and if 2% is corroded, huh, no guarantee. If 4% is corroded, you win, you've got a guarantee. Well, I mean, I think what you're doing there, Your Honor, I'd respectfully submit, is you're replacing the word deductible applies with guarantee applies. And maybe if it was written in that way, it would have been clearer. But that's not the way the language is written. And the problem with that interpretation, beyond just the language of 2.03 itself, is if you interpret it that way, then you make the exclusion in 4A irrelevant and superfluous. Because the exclusion in 4A talks about neglect. It talks about improper cleaning. It talks about structural defense. And all of those things have absolutely nothing to do with chemical attacks that corrode the material. And it's not me saying this. It's their own witness saying this. If you look at the declaration submitted by David Keehan, paragraph 25 of that declaration says that these kinds of acts, and he lists a bunch of them, are not related to chemical attacks. I'm sorry, these kinds of acts are the 4.0 chemical attacks. That's correct. That's correct. And he doesn't use the exact same words, but my submission is if you line up that paragraph that I just gave you of his declaration with the acts that are contained in 4.01A, you will see that each of those acts relates to things that cannot be caused by a chemical attack. So what I mean... You said that we were elapsing the contractual definitions of guarantee and deductible ingredients, and I just misunderstand you. What I'm saying is the way this language is written, you would have to take that definition of deductible and plop it into that sentence that immediately follows it, where it says deductible applies only when exceeding 3%, and that doesn't make sense. Wait a minute. Are you saying that 2.03 is a definition of deductible? Yes. That's exactly what the beginning of that sentence says. For purposes of this guarantee, deductible means that. So really, Your Honor, this applies only where the contract uses the phrase deductible, and that, in my view, is what makes it unintelligible. So you're saying 2.03 should have no meaning at all? No, Your Honor. I think you can do in this case what Judge Breyer did in U.S. v. Data Translations, the case we cite, and you can give it what I would call a practical meaning based on the contracts as a whole. And that brings me back to the other document I was discussing earlier, which is the contract between the shipyard Let me just stop you there and say when you say you should give it a practical meaning, are you saying the practical meaning is that they made the guarantee good even if it's only one-tenth of a percent of area? The practical meaning is that they made the guarantee good. It's a broad performance guarantee. What I think they are entitled to based on the writings as a whole is a normal 3 percent deductible, which is what the contract between the shipyard and Vance Pollard said they were going to do. As I read the last sentence, it seems to say there's a deductible of 10 percent and there's a deductible of $100,000, which seems to be where you would normally bring in your money. Right? What does that last sentence mean? If your damage was $100,000, don't you read that last sentence to say you wouldn't get anything? I think that further illustrates my point that the section is unintelligible. Because if you're going to read that section, you've got to read it in light of, if we're going to take this literally, we've got to follow all the way through and take the whole thing literally. If that's the road, the path this court takes, that means that the first sentence, which defines deductible as meaning a corrosive attack on the deductible area, applies to that sentence as well. It's using the word to mean two different things. It's not the world's best writing, but it's talking area at the top and it's talking money at the bottom. Why isn't that a practical meaning, that this was written by shipwriters rather than lawyers? Well, the thing is, it says that, in the first sense, for purposes of this guarantee. What I'm telling you is, I think we need to move beyond this. If you look at the warranty, if I may just finish with this comment, if you look at what the contract says between the shipbuilder and Advanced Polymer, it says that the Advanced Polymer will issue a five-year guarantee with a 100%, with a 3% deductible. It's in Section 2 of that contract. They later clarify in Section 18 that there will be no exceptions. That warranty obviously was meant to pass to the shipowner, because why would a shipyard care about a five-year guarantee? My submission is, you have to read what they said in this separate warranty that we've just been discussing, in light of what that contract says. I think you can use that. Thank you. Members of the panel, my name is John Manos. I represent Advanced Polymer Coatings. If you are going to operate a chemical tanker at an international conference, you have to have the cargo tanks coated with a paint that will withstand chemical attack. My client is one of a handful of companies that manufactures the product. It's been approved by the United Nations IMO, International Maritime Organization. I'm just curious why you say that the language of this representation claim, in this case, is part of a maritime law. Obviously, the ship is going to be used in international commerce, but this is the... This claim involves damage that occurred after these tankers were placed in the service. If you look to general maritime law, if it's out on the seas in trade, it's covered by maritime law. There is no question that both of these vessels were out trading before they were re-coated in China. The reason they were allowed to remain in trade is because the loss of the top coat of marine line will not affect its chemical resistance at all. The top coat is gray. The base coat is red. The reason you put on a gray coat on top of the red, the red is where your chemical resistance has to be. The gray is there as an early warning device. If your coating is being chemically attacked, the gray will go away and you'll be able to see the red. You can then take appropriate measures before the chemicals get through the red coat. That's why it's there. Now, what happened in this case is that after the red coat was applied, but before the gray coat was applied, the shipyard failed to maintain the environmental controls. Now, this coating is an epoxy, which is a dual-cure system, meaning that you have an initial cure, which takes it from a liquid to a semi-solid, which is called B-stage. You then, after the second coat is applied, bake the coating at 189 degrees for eight hours, which drives all the cross-laying. Now, what happens with the amines is they're creating a chemical reaction with the epoxy, which causes the end caps of the epoxy to open up. I'm probably going too far into the weeds on chemistry. You're talking a lot more than science here. Okay. Something went a little bit wrong. Well, we know exactly what went wrong. The amines in the curing agent will react with CO2 and moisture in the air at low temperatures. Now, when this occurs, it results in what is called carbamation. And carbamation will result in carbamates forming on the top of the newly-coated surface. Now, you can't detect these carbamates in the field. The only way you can know that they're present is to take a coating sample. Can you get to talking about the law part of it? Right. Is that something went wrong enough that you can cross some of that? But, no, that's important, Judge. That's critical because we know what went wrong. Okay. Right? This coating was not chemically attacked. The top coat did not bond completely to the base coat because the shipyard failed to maintain the environmental controls. That fact is undisputed. Now, what they also did with this first tanker is that instead of using electric heaters, they used dirty gas-fired heaters and contaminated the base coat with carbon. So we told them, told the shipyard, told the owner, we are not accepting responsibility for the chemical resistance of 12 of these 20 tanks. And the insurance policy that we issued said we are not covering these 12 tanks. The insurance policy is the same. I'm sorry. Is that in this same document that we were talking about Section 203 of? Actually, Your Honor, it's Exhibit B-7 to our motion for summary judgment. If you don't have that handout. Well, I'm looking at Exhibit D. Now, it doesn't say B-7. This is the Insurance Guarantee Warranty Protection Coverage Part Supplemental Declaration. You've been arguing about the 2.03. Your Honor, I don't have an approach. No. This is the record. That's a different document. Well, this is B-7 to our motion for summary judgment. And that was issued at a later date. No, this was issued at the same time. This is part of the insurance policy for the first ship. And so that's as of 2010? Yes. February 1 of 2010? Yes, Your Honor. And does the closing counsel have that? Because we know that's what we're looking at. I'm sure that all of us know what we're looking at. All right, so that's Exhibit B-7. Thank you, Your Honor. And that says we're not accepting responsibility for these 20 tanks? Twelve of the 20. Twelve of the 20 were contaminated with carbon. The next tanker, it was determined that there was a lack of detail. The next tanker is in Ballston, is that right? Yes, Your Honor. The way the contract between APC and the shipyard was structured is that Advanced Polymer Coatings had to have an inspector present that was knowledgeable about the application, to observe the application and make sure it met guidelines. That inspector had to work jointly with the shipyard's inspector. SOS also had an inspector there. And the owner also had an inspector. Now, the contract between the shipyard and my client said that when the work is completed and the shipyard is satisfied with the work, the shipyard is going to issue a completion certificate acknowledging that we have completed our scope of work and that all three inspectors have to sign off on it. Now, we completed our work. Completion certificates were issued. They were issued with knowledge that this coating had been contaminated, but the shipyard and the owner made a decision, we're going to accept it the way it is. The coating was applied correctly, the shipyard contaminated it, and so as far as APC is concerned, they have no responsibility. Just to stop you there, is there only one completion certificate in the sense of each one of these three people does not issue a separate completion certificate? No, the shipyard prepares a completion certificate in advance. All three inspectors have to sign off on it. All right, go ahead. So after these completion certificates are issued and after the insurance policies are issued, ensuring the chemical resistance of this coating, we come to find out that we have issues with the inner coating adhesion. My client stepped up to the plate and said, look, we're not going to argue over blame. Bring these ships, the one that's already sailing, back into the shipyard. We'll figure out which tanks have this weak coating, and we'll replace it at no cost to the owner. The ones that's in the shipyard, we will redo coating at no cost to the shipyard, or at no cost to the owner. What we expected the shipyard to do was go back and do their part of the contract, which is blast the tanks to get them ready for coating. Put up the scaffolding so you can reach the upper areas of the tank and maintain the environmental controls. That was their part of the job. We would then redo ours. The shipyard had no part of it. The shipowner had not accepted delivery of the second tanker yet and told the shipyard, we won't accept it until you fix this coating to conform with the contract. My client urged them to stand their ground. They have the leverage. Make this shipyard participate in the repair. The shipowner decided not to do it. Now, they did approach us and say, you offered to provide this coating and keep your free of charge. Will you stand by that offer if we have these ships coated elsewhere? We said, sure. So they had the first ship recoated in China in September 2010, waited a year, kept operating the second tanker for a year before they scheduled it to be recoated in China in November 2011. We stepped up, provided the coating, provided the heat cure and the charge. Now, after the first ship was done, they presented us with a big bill under the insurance policy. And we said, no, you don't have any coverage. You know why these things fail. It has nothing to do with chemical corrosion. They went and engaged counsel to evaluate pursuing arbitration under this insurance policy and elected not to do it. A year later, they asked us for more coatings. I think I missed something here. So when your company said, you know, we'll cover it if you get it coated elsewhere, what exactly were you offering them, if not to pay for the service that's done elsewhere? What we wanted them to do is bring the ship, the back wall that's already out there, bring it back to the SLS shipyard. SLS is there, and we're going to coat tanks. You have to first sandblast the metal. You have to erect scaffolding, and you have to have environmental controls. That's the shipyard's responsibility. You were offering to do your part of it but not to pay for the other people's part of it. Right, and we told them that if you elect to take this vessel elsewhere, if you don't force the shipyard to fix what they have done, we are not going to be responsible for those expenses. Okay, but let's try to get back to the law. The other side has made an argument as to why this insurance document is such that you ought to pay for it all. Can you point to what your argument is as to why they're wrong, either why there's an exclusion, why there's a misinterpretation, and tell us what your side of it is. I can just read the language. This guarantee only becomes effective Okay, so you're focusing on 2.03, and you're saying that it defines what the risk being insured is. This is not a warranty. This is an insurance policy, and it insures the chemical resistance of this coating. If more than 3% of a tank sustains corrosive attack of the coating, coverage applies, subject to a dollar deductible. Until you have more than 3% corrosion in a tank, there is no insurance. Now, as far as the argument... Is your position here that there's no cracking for corrosive attack because the top coat problem isn't an integrity of the coating material? It's not corrosive attack. And the base coat never got corroded. I mean, they traded... Your position is that the right number there is zero, and therefore that's an exclusion. Correct. Now, what about the discussion about 4.0, which is a different set of exclusions? There are a number of things that can happen to a coating that can impact its chemical resistance. If you have... Are you relying on any of those under 4.0? Does 4.0 have any relevance, or are you just saying that you win under 2.03? Because the other side was the one that started talking about 4.0. You don't even get to what caused this corrosion of the coating, right? You never get to excluded causes. I guess your position would be if they're just out there with hammers punching holes in it or something. That's exactly right, Your Honor. If you have mechanical damage... Then it's not your responsibility. Okay. All right. So there's no coverage on that. Now, as far as this claim of negligent misrepresentation, that is not a claim that is recognized under the facts of this case. Negligent misrepresentation only arises if there is a duty independent of contract. If APC was an accountant or a professional, you have malpractice. That is a common law as opposed to a contractual duty. In this case, APC was required by its contract with the shipowner to have an inspector present. APC did not prepare these completion certificates. The completion certificates were prepared by the shipyard and all three contractors signed off on them. At the time, MISC took the liberty... By signing off on it, weren't you making some type of representation? Yes, that our work had been completed in accordance with our specifications. We're talking about the shipyard's responsibility here. At the time, they accepted delivery... Does that mean your position is we did our work right? They didn't do their work right, which affects the ultimate tank, but our responsibility under the tank is whatever our insurance contract is. That is correct, Your Honor. The other reason that their negligent misrepresentation claim fails is that you cannot recover benefit of the bargain damages under a negligent misrepresentation claim. They are looking for their contractual damages. The cost incurred to put this coding into condition required by the contract. Now, there is no property damage present in this case. What you have is an economic loss, and under the law of Ohio and under general maritime law, you cannot recover economic damages through a negligence action. The last reason that this panel should affirm the court's summary judgment is all of their claims are barred by the four-year statute of limitations. Okay, we've seen that. Any other questions, judges? Okay, thank you. You'll have time for rebuttal. How much time? Five minutes. Thank you, Your Honor. A few points. I'd like to start by clarifying the reason why we refer to Section 4 of the Insurance Guarantee Warranty Protection Coverage we've been talking about. The submission is not that that's the basis on which they denied coverage. The submission is that the reading of Section 2.03 there, proffering, would render that clause superfluous, and so to interpret that warranty as a whole, you cannot limit coverage to a solely corrosive attack. Secondly, on the Section 552 negligence claim... That's what it says, right? It says it shows any breaking integrity of the decoded material due to corrosive attack. That's the way it defines the term deductible. Well, but I mean, that's... Yeah. But I mean, it says that's what we're... And so deductible applies only when exceeding 3%. And so this goes back to the discussion earlier. I understand where you're coming from. But I don't think... Reading that language as it's written, I don't think you can say that it limits the guarantee as a whole. It's defining a term deductible that appears only in Section 2.03. It's circular. It's self-referential. It's incomprehensible. And I think if you interpret the language as a whole, in light of what the exclusions say, in light of the course of performance, this document that they're now talking about, they didn't bring up this it's only limited to corrosive attack argument when we first approached them for warranty coverage. They said, well, the first 12 months should be with the shipyard. We pick it up after that. And that's obviously not true the way the insurance guarantee is written. The responsibility ultimately rests on them because they were responsible for supervising the application for directing the shipyard to take appropriate corrective action if necessary. That's right there in their contract. Section 19 of the contract with the shipyard required Advanced Polymer to correct any flaws in the process. That's why this is a broad guarantee. The entire responsibility for this process rested on Advanced Polymer's shoulders. That was the way the three parties agreed to divide this up. What you're talking about is section 19. Just to make sure I've got the right documents. The document I'm looking at is headed at 19. Inspection. Seller shall duly execute with craftsmanship. That's correct, Your Honor. It has a contract between buyer and seller, neither of which is APC. That's correct. That's correct. It doesn't say APC will execute. It says Advanced Polymer will take corrective action if it finds problems through its inspections, and that's in subsection C, Your Honor, of section 19. Haven't they offered to take corrective action? Didn't they say you bring your boat in, clean it up, get it ready for us, and we'll put the new polymers on? Well, they offered... They offered to do something, and I'm not fighting that they offered to do something. I don't think they did offer to do what the guarantee required. You all didn't do anything. We didn't do... I'm sorry. You all didn't take them up on it. We accepted the free materials, and we did get the vessels fixed. We did what we needed to do to get the vessels back in service as quick as they can to minimize our loss. That's what we did, and we did take them up on the free coating material they offered, absolutely. What we didn't get was the 100% repair guarantee under section 2.02 of the warranty that we thought we were entitled to, and that's part of what we're fighting about here today. Counsel, let me just make sure that I'm right. I heard you say subsection C. What I'm looking at is 1, 2, 3, and 4. I'm sorry. My apology. It is 3, Your Honor. It is 3, but again, it's... ...execute modifications and corrections. We're still on the question of whether APC is bound by this as the seller. Right. Right. We got that separate argument. I just want to make sure I got the right document. You do, Your Honor. I said C. I meant 3. There are so many documents. There are a lot of documents, and I'm glad we're on the same page. Yes. So just to circle back real quick, the Section 552 Negligent Misrepresentation Claim, that is a duty separate from the contract. It's a duty recognized in tort law. It's a duty recognized in this case, this court's HGM fluke-off case that we cited in our briefs. I don't think maritime law applies here. We cite case law in our briefs. There's a location component to the maritime jurisdiction test. The location of the wrong here was the negligent misrepresentation. That occurred on land. I think, at a minimum, you should reverse and remand on this negligent misrepresentation claim. Everything I've heard from the other side does not defend the district court's decision, which is based on a flawed represent, we believe, flawed view of reliance. They're talking about other factors and making different arguments. And with that, if there's no further questions. Thank you. That case will be submitted. So we're going to stand with respect to the counsel before we select the case.